IN THE MATTER OF THE ACCOUNTING OF HARVEY JOSLIN, ASSIGNEE OF HENRY M. GOEBEL, INSOLVENT.

[See 81 Mich. 413; 90 Id. 71.]

*Assignment for benefit of creditors—Right of wife of assignor to purchase at sale—Duties and liabilities of assignee—Compensation.*

1. The wife of an insolvent debtor has the same right as any one else to purchase the assigned property at assignee's sale; and the mere fact that a third party makes such purchase in her interest is no evidence of fraud on the part of the assignee.

2. In the absence of evidence to show an actual appropriation of goods, or of money received upon sales, it would certainly be a harsh rule to hold an assignee of an insolvent debtor liable for an assigned stock of goods at its appraised value.

3. The fact that an assignee has been loose in some of his methods, and negligent in not preserving the original inventory of the assigned property, which was taken on loose sheets of paper, and certain other books and documents, is not a sufficient reason for charging him with the loss of all compensation for his services.

4. The assignee of the stock in trade of an insolvent debtor continued to carry on the business at retail, and to that end employed the assignor at a weekly salary, and placed him in charge of the main store. And it is held that the wisdom of such employment depends entirely upon the character of the assignor; that it may have been for the benefit of the creditors, he being more familiar than any one else with the business, the character of the goods, and the responsibility of his debtors.

Appeal from Kent. (Grove, J.) Argued April 28, 1894.
Decided September 25, 1894.

Appeal by creditors from the allowance of the personal
account of Harvey Joslin, assignee of Henry M. Goebel,
insolvent. Decree modified and affirmed. The facts are
stated in the opinion.

*Taggart, Knappen & Denison, Fletcher & Wanty,* and
*Bundy & Travis,* for appellants.

*Harvey Joslin* and *Butterfield & Keeney,* for the assignee.

GRANT, J: For some 17 years prior to August, 1888,
Henry M. Goebel had been engaged in the business of
merchandising in wall paper, paints, oils, and work con-
nected therewith. August 31 of that year he made a
common-law assignment to Mr. Joslin for the benefit of
his creditors. It is not necessary to relate the circum-
stances which caused the assignment. He had two stores
in Grand Rapids, one at Battle Creek, and was also inter-
ested in another at Kalamazoo. Others were interested
with him in the Kalamazoo store, which was also assigned
to Mr. Joslin, but does not enter into this litigation. An
inventory was taken, bond given within the statutory 10
days, and Mr. Joslin took possession, and entered upon
his duties. Mr. Goebel's liabilities were $48,151.49. His
assets, including stock at cost price and accounts receiv-
able at their face, were $56,961.03. The appraised value
was $43,345.23. Deduct Kalamazoo stock, $8,998.81, and
the appraised value of stocks here involved is $34,346.42.
Shortly before the assignment, Goebel deeded a house and
lot in Grand Rapids to his wife. The creditors, claiming
that this transfer was fraudulent, obtained permission
from the court to file a bill in chancery, in the name of
the assignee, to set aside the deed. The amended bill was
filed November 16, 1888. The date of the filing of the

original bill does not appear. The courts did not find the transfer fraudulent in fact, but held that Mr. Goebel had an interest in the property of the value of $4,020.86. *Joslin v. Goebel*, 90 Mich. 71. Mr. Joslin continued to carry on the business at retail, but whether by direct authority of the court does not appear.

November 30, 1888, he rendered an account to the chancery court of his doings as assignee to November 24, which report covers 38 printed pages. From this it appears that his cash sales amounted to $4,719.27, and his collections of old accounts to $2,694.88. It was apparent that this method of disposing of the property was unprofitable. The creditors, who were represented by several attorneys at Grand Rapids, on December 26, 1888, presented a petition to the circuit court for the county of Kent, setting forth the substance of this report, and charging, under advice and belief, that the assignment was managed and conducted in the interest of Henry M. Goebel, and not in the interest of the creditors; that the design of so conducting the business was to keep it alive, in the interest of said Goebel, instead of seeking to effect an expeditious, economical, and advantageous closing up of the business; that Goebel was employed in the Canal street store, which was the principal one, at a salary of $25 per week, and had the charge and management of the business. The petition prayed that the assignee be ordered to consolidate the three stocks of goods, place them in the Canal street store, and in the basement and ware rooms used in connection with the same; that the assignee be directed to take steps at once for the sale of said stock at auction, and a time ordered when such sale should begin. We do not find the answer to this petition in the record, but it appears from the order made by the court January 2, 1889, that the assignee made answer. By this order he was directed to proceed at once to advertise the goods to be sold, either in job lots

or the entire stock, and to sell them for the best price he could obtain, subject to the approval of the court. Under this order, the particulars of which it is unnecessary to give, he caused the goods to be arranged in job lots for sale. Meanwhile he had procured an offer of $500 for the Battle Creek stock. This was reported to the creditors and the court, and the sale ordered to be made. It was made, reported, and approved, and no objection made to it until the reference of the assignee's accounts to the commissioner. Some of the job lots were sold, the largest being one for $4,300 to Bissell, Studley & Foote. This sale was contested by the creditors, but was confirmed by the court, and no appeal taken. The remainder of the goods was then sold at auction, the assignee himself acting as auctioneer. The sale took place at the store where the goods were situated, and the attorneys of the creditors were present. This sale, by which all the goods were closed out, began February 7, 1889. It is evident that the order of the court was promptly complied with, for in the assignee's second quarterly report, made the last of February, 1889, he reports these sales. His account of the receipts is there stated as follows:

Canal Street Store.

| | | |
|---|---:|---:|
| Cash collections | $ 481 | 39 |
| Cash sales, retail | 2,682 | 49 |
| Cash sales, job lots | 4,300 | 14 |
| Cash sales, auction | 4,925 | 56 |
| | $12,389 | 58 |

South Division Street Store.

| | | |
|---|---:|---:|
| Cash collections | $ 6 | 90 |
| Cash sales, retail | 431 | 44 |
| Cash sales, entire stock | 575 | 00 |
| | $1,013 | 34 |

Battle Creek Store.

| | | |
|---|---:|---:|
| Cash collections | $ 5 | 00 |
| Cash sales, retail | 328 | 84 |
| Cash sales, entire stock | 500 | 00 |
| | $833 | 84 |

On May 20, 1891, the court made an order of reference to Hon. John S. Lawrence, of Grand Rapids, to take testimony in regard to the assignee's accounts, state an account, and report the same to the court. Before entering upon the consideration of this reference and the contested items, we refer to certain other transactions between the creditors and the assignee.

As early as September 17, 1888, the creditors filed a bill in chancery against Mr. Goebel, his wife, his stepson, Cook, Henry D. Kingsbury, and the assignee, praying for the removal of the assignee and the appointment of a receiver. This bill set up the transfer to Mrs. Goebel, already referred to, and other transfers to Mr. Cook and Mr. Kingsbury shortly before the assignment. In this bill they charged that the assignee had been the attorney of Mrs. Goebel prior to the assignment; that he drew the deeds conveying the property; that they requested him to subject said real estate to the terms of the assignment; that he refused to comply, stating that the deed to Mrs. Goebel was *bona fide,* and was for money and property which she had furnished in purchasing the premises. No charge of dishonesty, or violation of trust, or neglect of duty is made in this bill, other than that he refused to institute litigation to subject the property mentioned in the bill to the trust. To this bill, answers were filed, and upon the hearing the court refused to remove the assignee, or appoint a receiver. Early in 1889 the creditors petitioned the court, under Act No. 215, Laws of 1889, for the removal of the assignee. This petition was not filed for any misconduct, but on the ground that they were entitled to his removal under the act, although he was appointed prior to the time the law took effect. The court removed him. He appealed to this Court, and the order of removal was vacated. *Old National Bank v. Joslin,* 81 Mich. 413.

The contested claims may, for convenience, be included in three classes: (1) Clerical errors; (2) unauthorized and illegal payments; and (3) negligent loss of assigned goods, or missing goods.

1. The clerical errors are few, insignificant, and need not be discussed. A statement will be handed down, disposing of them.

2. The same may be said as to unauthorized payments.

3. The principal claim of the creditors is that goods to the amount of several thousand dollars have in some way disappeared, and that such disappearance and consequent loss are the result of the carelessness and negligence of the assignee, for which he should be held liable. This claim appears in the amended order of reference, under the head "Surcharges," and is stated as follows:

| | | |
|---|---:|---:|
| Loss on goods sold at retail, and below inventory value | $1,000 | 00 |
| Loss on inventory on wagons, sleighs, and harnesses | 47 | 00 |
| Costs collected in Supreme Court, not charged | 47 | 50 |
| Costs collected in Bissell, Studley & Foote matter | 28 | 10 |

The following jobs done by, or paid for to, H. M. Goebel while in assignee's employ:

| | | | |
|---|---:|---:|---:|
| M. R. Bissell | $512 11 | | |
| McCord & Bradfield | 50 00 | | |
| W. H. Anderson | 80 00 | | |
| A. Preusser | 110 00 | | |
| J. B. Brittain | 225 00 | | |
| Dr. Best | 190 00 | | |
| | | 1,167 | 11 |

| | | |
|---|---:|---:|
| Wall paper unlawfully given to Goebel as exemptions | 250 | 00 |
| Goods shipped to Battle Creek, January 5, 1889, not accounted for | 800 | 00 |
| Goods shipped to Battle Creek, January 9, 1889, above amount accounted for | 1,050 | 00 |
| Attached stock not accounted for | 800 | 00 |

Other goods, details unknown, which, or the

| | | |
|---|---:|---:|
| proceeds of which, reached Mr. or Mrs. Goebel, and not accounted for | $2,500 | 00 |
| Value of South Division street lease above amount received | 25 | 00 |
| Amount received from Hetherington for services | 10 | 00 |
| Goods sold to S. M. Goebel, private sale | 99 | 41 |
| Money received for odds and ends | 10 | 00 |
| Cash on hand at time of assignment in South Division street or Battle Creek store, amount unknown | | |
| Value of Battle Creek stock above amount received | 500 | 00 |
| Interest on trust funds unnecessarily retained, mingled with his own, and allowed to be retained by others | 500 | 00 |

Amendments to this claim were subsequently allowed.

It is conceded that Mr. Joslin appropriated none of the goods or money; that he did not knowingly permit Mr. Goebel, or any other person, to take them away, or appropriate the moneys received therefor; and that he did not in any manner profit by the disappearance of the goods, if there was any. It is also established beyond controversy that no goods were stolen or removed, except those sent to Battle Creek. The goods were bulky, and the employés of the assignee testify that it would have been impossible to remove goods of any considerable value without their notice. This also is substantially conceded. The position of counsel for creditors is stated in their brief as follows:

" The shortage which the commissioner found at appraised values was a little less than $6,000. The commissioner did not find that the missing goods had disappeared from the store, and, except as to part of them, the creditors have never made any such claim. Indeed, our complaint is, as to a part of this property, that it remained at the store during and after the sales, and until Mrs. Goebel came into possession, and without being accounted for."

The sale of the Battle Creek stock for $500 was made to one Jones, who, it appears, did not buy for himself, but for Cook, Mrs. Goebel's son, who afterwards trans-

ferred it to her. Bissell, Studley & Foote transferred the goods they purchased to Mrs. Goebel. She rented the Canal street store after the auction sale, and entered into business there, placing her husband in charge. Considerable is said in the briefs about these two sales being made in the interest of Mr. and Mrs. Goebel. There is no reliable testimony to show that Mr. Joslin colluded with any one else in these sales, or even that he had knowledge that the purchases were made for Mrs. Goebel. If they were so made, it would be no evidence of fraud. Both purchases were ratified by the court, and would have been valid if they had been made to Mrs. Goebel direct. She had property, and possessed the same right to purchase as did any one else. But, as to the sale of the Battle Creek stock, criticism is put to rest by the report of the commissioner, who said:

"It is due to the assignee to say that there is no showing that he was aware at the time of the sale that Jones was not a purchaser of the property in good faith."

It is equally clear that Bissell, Studley & Foote purchased in good faith. After their purchase, Mrs. Goebel mortgaged her property, and paid them for the goods. We find no evidence of unfairness or misconduct on the part of the assignee in either of these sales. In the former the facts were fully presented to the court, and were known to the attorneys for the creditors, with the exception that they did not know of the two shipments of goods from the Grand Rapids stores to the Battle Creek store, which will be hereafter referred to. The court and creditors were fully informed of all the facts in regard to the sale to Bissell, Studley & Foote. This sale having been confirmed, all questions in regard to it are at rest.

Counsel for the creditors claim that the proofs show that most of the goods sold at retail brought prices equal to or above the appraised value. Upon this basis they

assume that there is a large deficiency, for which they seek to hold the assignee. They insist that several tons of paper were sent to Battle Creek; that wall paper of unknown amount and value was set out to Goebel a second time, as exempt under the statute; that the property sold to Bissell, Studley & Foote, and through them to Mrs. Goebel, remained in the store or warehouse, and thus afforded an opportunity to appropriate, as included in that sale, almost any desired amount of property; and that certain property attached before the assignment was not all accounted for, but that portions thereof remained in the subbasement at the time of the closing-out sale.

To hold that goods were left in the store, unsold, would be to run counter to the evidence of all those who assisted in arranging them for sale, and who were at the sale. The goods were in different rooms. The creditors were represented by their attorneys, who watched the sale. Those who conducted and were present at the sale testify that all the goods were sold. They had the best of opportunities to know, and there is nothing to impeach their testimony, except the inference that there was an actual shortage because the appraised value was not realized. It is contrary to reason to suppose or to find that $6,000 worth of goods escaped the attention of Mr. Joslin or his employés, and the keen eyes of the creditors, who were watching every movement made by the assignee. The commissioner, in paragraph No. 47 of the objections, under the head "Shortage," states the manner in which he reaches his conclusion. He places the stock, as inventoried, at $20,684.09. He deducts the retail, job lots, and auction sales, and two small items, thus leaving for goods unaccounted for $3,023.53. He is of opinion that this does not represent correctly the actual shortage, but that it was materially larger. He then divides the goods into two classes, wall paper and other goods, takes the inventory of the

paper, and fixes an average price by taking certain sales, and estimating the value by them. He then states that some old goods must have accumulated, which, if sold at all, would naturally be sold low. He fixes the amount of such goods at 10 per cent., and puts them in at appraised prices. He fixes at an advance of 50 per cent. 40 per cent. of the goods, and estimates the remainder of them at 93 per cent. profit. In this way he establishes the retail value of the goods appraised at $8,350.16 at $17,-371.11, from which he deducts the retail sales reported, less pay roll, $5,116.49. In this way he fixes the shortage, for which he holds the assignee liable, at $12,254.62, retail value. He then says:

"That the proceeds of goods to the amount of over $12,000 disappeared during Mr. Joslin's administration as assignee, and with his consent, I am unwilling to believe; but all the testimony leads me to the irresistible conclusion that, except in name, Henry M. Goebel was allowed to be his own assignee, and made himself a preferred creditor without proving his claim. The goods may have disappeared from the store bodily, and in any case I do not think the assignee can be charged more than their appraised value.

" I propose to obtain the value of the shortage at appraisal prices. To be accounted for, $8,350.16, which had a retail value of $17,371.11, or 208 per cent. of appraised value. Retail sales reported, $5,116.49, which, at 208 per cent., appraised value, makes that value $2,459.85.

```
To be accounted for at appraised value_____$8,350 16
Appraised value of goods retailed_____ 2,459 85
                                                 _____
          Shortage_____$5,890 31
```

" I think this is the lowest amount at which the shortage can be properly computed. It covers the shipments to Battle Creek, above the $150 received; the value of the wall paper set out to Goebel as his second exemption; and the profits on materials taken by Goebel for his jobs.

```
I allow for these_____$1,390 31
And the balance, as the full amount claimed as
    shortage in the amended surcharge_____ 4,500 00
                                                   _____
                                                   $5,890 31"
```

It is impossible to tell the specific goods which were sold at retail. At first the assignee required the items of goods sold, as well as the amount, to be reported. This was found to make additional expense, and was abandoned, and each salesman reported to the cashier the amount only of each sale. In this manner the business was conducted before the assignment. Some goods were sold below appraised prices. How many, and to what extent, is matter of conjecture. It required no evidence to prove that stocks of this character have considerable of old, shop-worn, and unsalable goods. The proofs show that this stock was not an exception. In the absence of evidence to show an actual appropriation of goods, or of money received upon sales, it would certainly be a harsh rule to hold a trustee liable for an assigned stock of goods at their appraised value. It must also be remembered that Mr. Goebel did not have a key to either the store or the money drawer; that he handled money only as he made sales, and reported the same, with the cash, to the cashier. Were this suit directly against Mr. Goebel, for the appropriation to his own use of either money or goods, there is no tangible evidence by which he could be held liable for one dollar's worth. Upon no sound principle, therefore, can the trustee be held liable. It is suggested that goods may have been appropriated by Mr. Goebel in jobs which he took upon his own account after the assignment, and while in the employ of the assignee. It is not enough to show an opportunity to steal or defraud. Undoubtedly, Mr. Goebel might have taken away more goods than he purchased for use in these jobs, but there is no proof of it. The testimony of himself and the other employés in the store is that he accounted for the goods so taken, and no one testifies that he took any more than he accounted for. There would be just as much reason to charge the other employés with appropriation of goods

or money. That goods were not stolen, misappropriated, or left in the store for Mrs. Goebel, seems to us apparent from the following statement: The appraised inventory of the assigned estate was $34,346.42. Sales and collections are $27,665.71. This leaves a shortage of $6,680.71. Counsel for neither the creditors nor the assignee agree with the figures above given as to the inventory. We have taken them from the recapitulation of the inventory, as found on page 83 of the record. Now, the shrinkages that appear conclusively established are as follows: On auction sales, $2,552.00; on stock of the Nason Lumber Company, $1,200; on bills receivable, $1,900.43. There are other small items, which need not be mentioned. These are enough to show that there is no such loss as is claimed, since the shrinkages on these items amount to $5,652.43.

### The Exemptions:

Mr. Goebel was entitled to an exemption. Goods were selected by him, and were undoubtedly chosen out of the best. They were set apart by themselves in the store, and marked. Subsequently, similar goods were required, in order to make sales of others. It was arranged that these goods should be placed back in stock, and that Mr. Goebel might make another selection. This was subsequently done. A subsequent agreement was then made between him and the assignee, by which these goods were also returned to the stock, and his exemption arranged and allowed by certain jobs for papering, which were outstanding at the time of the assignment. This arrangement was made upon the knowledge and advice of the circuit judge, and was afterwards ratified by him. We find nothing wrong in the arrangement, and no evidence that the interest of the creditors was injured thereby.

### Outside jobs:

The assignee claimed that he was entitled to the profits

from outside jobs outstanding at the time of the assignment. As already shown, this was settled by the authority of the court in the exemption matter, and need not be further mentioned. After the assignment, and while Mr. Goebel was in the employ of the assignee, he took a few other jobs upon his own account, hired and paid his men, bought the goods of the assignee at the usual prices at which they were sold to others, and received whatever profits were made. This course was known, and received the sanction of the assignee. The propriety of such course may possibly be questionable, though there is no impropriety in permitting a clerk to perform work outside of his employment, so long as that does not interfere with the interests of, or his duty towards, his employer. The testimony appears reasonably conclusive that but little, if any, of his time which belonged to the assignee was used in attending to these jobs. We see no good reason why an employé who purchases goods should be charged more than other parties. To enter upon these jobs was not a part of the assignee's duties, and if, in so doing, loss had followed, he would undoubtedly have been responsible for such loss.

### Battle Creek Sale:

The Battle Creek stock was put in by the appraisers at the cost price, and then 25 per cent. deducted from the total to fix the appraised value. When the assignee reported the offer of $500 for the sale of the entire stock which was left, he reported the appraisal of the stock as it then stood, made by the original appraisers, and they recommended the sale. The cost of removal to Grand Rapids was also stated. This stock did not include the shipments of January 5 and 9 from the Grand Rapids stock. We think that all the facts in connection with this sale were reported and known to both the court and the creditors, that Mr. Joslin was guilty of no suppression

of facts or deception, and that he cannot now be held liable, after its ratification by the court, even if it were shown that the sale was an unwise one. It is, however, by no means established that the sale was not for the benefit of the creditors. An examination of the inventory of that stock discloses the fact that it was composed very largely of low-grade goods. It is manifest that during the four months of retail sales the better class of goods were disposed of.

### Sales and Shipments of January 5 and 9:

We think the creditors have failed to establish that goods of the amount or value claimed by them were included in these shipments. Nor do we find any evidence of dishonesty or culpable negligence on the part of the assignee. The shipment of January 5 was 147 bundles of paper, weighing 5,910 pounds. The shipment of January 9 consisted of 17 bundles of paper, weight 850; 12 cases of paper, weight 2,690. The first shipment was of common paper, for which the assignee has accounted at $120. Counsel for creditors claim that it was worth $252. This is upon the basis that 2,000 rolls of this shipment were gilts, which were appraised at $5\frac{1}{4}$ cents per roll. This claim is based entirely upon the testimony of one Strickland, who was employed in the Battle Creek store, who testified to the opening of these goods, as well as the shipment of January 9, and to placing them in the racks in the store. He did not know the value of the goods, nor was he able to state how many were gilts. The assignee was not present when this shipment was made, but had given instructions to ship some of this low-grade paper to Battle Creek. We think it established by a fair preponderance of evidence that there was no such amount of high-priced paper shipped to Battle Creek in these two shipments as counsel for the creditors contend. We find

no reliable testimony which places the value of the first in excess of $120, or of the second in excess of $150. The assignee testified that if, upon further investigation, he should become convinced that goods of greater value were shipped, he should take steps to recover them. This should be done.

The claim for loss on goods sold at retail below inventory value was withdrawn upon the hearing before the commissioner.

### Compensation:

The commissioner recommended that the assignee should be required to seek compensation elsewhere than out of what remains undivided of the trust fund. This is based upon the conclusion reached by the commissioner that the assignment was managed in the interest of the assignor, and that he permitted the assignor to plunder the estate without any attempt to interfere. The circuit judge, who was familiar with the conduct of the assignee from the beginning to the end, and before whom the homestead case was tried, and who heard also the contest over the Bissell, Studley & Foote sale, as well as the various other litigated proceedings in the case, arrived at the contrary conclusion. We are constrained to concur in the conclusion of the circuit judge. That the assignee was loose in some of his methods, and that he was negligent in not preserving the original inventory, which appears to have been taken on loose sheets of paper, and certain other books and documents, is true. But we do not think this sufficient to charge him with the loss of all compensation. The wisdom of the employment of an assignor depends entirely upon the character of the assignor. In many cases his employment would be for the benefit of the creditors, for he is more familiar than any one else with the business, the character of the goods, and the responsibility of his

debtors. The assignee testified that he was advised by one of the attorneys, who represented one-fourth of the creditors, to employ Mr. Goebel. This is not contradicted. Not until after the first account was filed, wherein it conclusively appeared that it was unwise to sell at retail, does any fault appear to have been found with the employment of Mr. Goebel. If there were proof that Mr. Goebel had stolen or appropriated any of the goods or money to his own use, a different question would be presented. The principal claim then made appears to have been that the assignee was continuing the business in order to enable Mr. Goebel to effect a settlement with his creditors, and not that there was a misappropriation of money or goods. Within a month or six weeks after this charge was made, the entire stock was disposed of, during which time there is no evidence that he removed any goods. Furthermore, there is nothing upon this record to show that Mr. Goebel, prior to his assignment, was regarded as dishonest, nor that the assignee had any knowledge or information to warn him that it was unsafe to employ him as a clerk. The compensation of the assignee will be fixed at $500, besides what has been allowed for his services and time in the various litigations in which he has been engaged. This compensation is small, but we do not think that the assignee is blameless in the unfortunate controversies in which he became involved with the creditors.

## The Attached Stock:

Prior to the assignment a creditor had brought suit against Goebel by attachment, and levied upon goods to the value of $841.31. The assignee petitioned the court to pay this claim, to replace the goods in stock, on the ground that they were needed in the retail trade. This order was granted, the claim paid, and the goods replaced·

It is now claimed that all these goods were not sold, but are a part of the shortage.    We find no reliable evidence to sustain the claim.

There are many other phases of this controversy in the briefs of the counsel for the respective parties, but we deem it unnecessary to discuss them.

Our conclusion is that, except as herein modified, the decree of the court below must be affirmed.   The assignee will recover his taxable costs, including a fee of $900 for his solicitors, to be paid out of the funds in his hands. The case will be remanded for a decree to be entered in accordance with this opinion, and for the closing up of the estate.

McGRATH, C. J., LONG and HOOKER, JJ., concurred. MONTGOMERY, J., did not sit.